**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0937-23

JD JAMESTOWNE, LLC,

      Plaintiff-Appellant,

v.

TOMS RIVER TOWNSHIP
ZONING BOARD OF
ADJUSTMENT,

      Defendant-Respondent.

_____

Argued November 18, 2024 – Decided May 14, 2025

Before Judges Gummer, Berdote Byrne, and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-1309-22.

Ryan M. Amberger argued the cause for appellant (Montenegro, Thompson, Montenegro & Genz, PC, attorneys; Ben A. Montenegro and Ryan M. Amberger, on the briefs).

Robin La Bue argued the cause for respondent (Rothstein, Mandell, Strohm, Halm & Cipriani, attorneys; Robin La Bue, on the brief).

PER CURIAM

Plaintiff, JD Jamestowne, LLC ("JD"), appeals from the trial court's order, dismissing the complaint with prejudice. The court dismissed the complaint because it found the amended resolution of the Toms River Township Zoning Board of Adjustment ("Board"), denying plaintiff's development application, was not arbitrary, capricious, or unreasonable. We agree with the trial court that the Board's decision was not arbitrary, capricious, or unreasonable because the denial of plaintiff's application was based on numerous factors supported by sufficient credible evidence in the record. Accordingly, we affirm.

I.

Plaintiff is the owner of the Jamestowne Village Apartment complex in Toms River, identified on the tax map as Block 610, Lots 1, 2, 3, 5, 11, 30, 31, and 33. The property is comprised of 17.9 acres in total and is primarily located in the Existing Multi Family Zone with some portions located in the Multi Family Zone, although the existing structures on the property were built prior to those zoning determinations. The parties on appeal claim[1] the property is currently improved with eighteen apartment buildings containing 266 units. The

---

[1] Although the parties stipulate to a certain number of units, the record reveals significant discrepancies regarding the current number of units on the property, which we discuss later in this opinion.

2

current zoning ordinance allows for eighteen units per acre. The parties stipulate the property may contain up to 319 total units, entitling plaintiff to build fifty-three more units without a density variance. However, in its development-project application, plaintiff sought to build 100 new units, resulting in a total of 366 units on the property. Thus, with the additional forty-seven units, plaintiff's application required a density variance.

Plaintiff sought approval of a site plan, lot consolidation, a density variance pursuant to N.J.S.A. 40:55D-70(d)(5) ("d(5)"), nine bulk variances and ten design exceptions. The specific relief requested in each variance category is as follows:

- One d(5) density variance for twenty units per acre (366 units total) whereas the maximum permitted density was eighteen units per acre (319 units total).

- Nine c(1) or c(2) bulk variances consisting of:

  o A bulk variance for a 9.6-foot buffer area width, whereas a minimum buffer width of 20 feet was permitted;

  o A variance for noncompliance with an ordinance prohibiting any structure, activity, storage of materials, or parking of vehicles within the buffer area;

  o A bulk variance for 26 feet between buildings with windows, whereas

a minimum of 60 feet was required;

- o A bulk variance for a principal building length of 256 feet, whereas a maximum length for a principal building of 175 feet was required;

- o A bulk variance for a multifamily dwelling setback from accessory drive and internal roadways of 25.9 feet, whereas a minimum of 35 feet was required;

- o A bulk variance for a principal building setback from parking area of 10 feet, whereas a minimum of 20 feet was required;

- o A bulk variance to the requirement that a "[b]uilding must have no more than two dwelling units in a line without setbacks and/or breaks in building elevation of at least [5] feet" whereas none were allowed;

- o A bulk variance to the requirement that "[p]arking is not permitted in front yard setback in residential zones for other than single and two family uses," whereas on plaintiff's application parking was proposed in the front yard for multifamily uses; and

- o A bulk variance for 573 on-site parking spaces, whereas the minimum required on-site parking spaces was 671.

In addition, the proposal sought ten design exceptions, summarized as follows:

4

- Allowing sidewalks to be constructed on only one side of internal streets, whereas sidewalks had to be constructed on both sides of all internal streets;

- Permitting four drives on Walnut Street and three drives on James Street, whereas not more than one two-way access drive were permitted on any street;

- Providing dead-end parking circulation, whereas dead-end parking circulation aisles was prohibited;

- Permitting no space provided for islands separating parking stalls from circulation and entrances or exit drives, whereas parking lots having fifty or less spaces currently required 10-foot-wide islands separating parking stalls from circulation and entrances or exit drives;

- Permitting four entrances proposed for Walnut Street with 1,191.81 feet of frontage and three exits proposed for James Street with 567.63 feet of frontage, whereas parking lots with a capacity of more than fifty vehicles and a frontage in excess of 500 feet on any one street were permitted two-way and one-way access drives for not more than two entrance and two exit movements on the street;

- An exception to the requirement that all entrance drives extend a minimum distance of 100 feet back from the street curb line or to an access aisle;

- An exception to the requirement that all exit drives extend a minimum

5

distance of 60 feet back from the street curb or to a major access aisle;

- An exception to the requirement that no parking stalls utilize the required entrance and exit drives or major circulation drives as access aisles;

- An exception to the requirement that a 5-foot minimum width landscaping area must be provided along the fence or wall enclosing the refuse storage area; and

- An exception from the requirement that all areas of the site not occupied by buildings, pavement, sidewalks, required screening, required parking area landscaping, required safety islands or other required improvements be landscaped by the planting of grass or other ground cover, and a minimum of two shrubs and one tree for each 250 square feet of open space.

These requested bulk and design non-conformities would be added to fourteen other non-conformities already existing at the site.

The Board held public hearings on the application over the course of four days, where plaintiff presented expert testimony, lay witness testimony, and other evidence in support of the application. The Board unanimously denied plaintiff's application, concluding plaintiff had not demonstrated entitlement to the requested major site plan approval, the d(5) density variance, or the associated c(1) or c(2) bulk variances pursuant to N.J.S.A. 40:55D-70.

Plaintiff challenged the denial by filing a complaint in lieu of prerogative writs, claiming the Board had not analyzed the d(5) density variance by evaluating positive and negative criteria as required by statute and had instead furnished a "net opinion" with respect to the requested variances.

At trial, the Board argued the application was not merely for density, bulk, and design-element variances with respect to an additional forty-seven units, but also for lot consolidation and major site plan approval of 100 new units. It argued plaintiff had failed to consider the existing site in its request for major site plan approval–and had focused only on the additional units that would require a density variance. For example, plaintiff sought to create enough new parking for 100 new apartment units but did not take into consideration the existing 266 units, which were not in compliance with respect to parking, to bring the entire complex into conformity. Likewise, it argued plaintiff was allocating affordable housing units for the new 100 units but was not considering the existing 266 units. It asserted if the density of the proposed project could not comply with the township's master plan and be consistent with the surrounding neighborhood, then all other variance and design requests were moot. Plaintiff countered that while its application would not bring the site into compliance with parking, open-space, affordable housing and other existing

A-0937-23

ordinances, those non-conformities would either remain static or become slightly improved.

The trial court remanded the matter to the Board after determining the resolution was legally insufficient in failing to specify the Board's reasons for denying plaintiff's application and because the Board's "net" reasoning denying the d(5) variance was insufficient. The court retained jurisdiction.

On remand, the Board issued an amended resolution, again denying plaintiff's major site plan application but with detailed findings and reasoning. In the amended resolution the Board explained: (1) the site was non-conforming as the density is already over the permissible density for that zone, and the intensified proposed nonconformity provided no benefit to the public; (2) the parking on plaintiff's property was nonconforming, and additional need for parking resulting from plaintiff's application would aggravate, not ameliorate, this issue; (3) the parking issue would require utilizing existing recreational open space and the placement of cars closer to the building, whereas plaintiff's land was noncompliant with the minimum required area for recreational open space; (4) the increased density on plaintiff's property would exacerbate an already-existing traffic issue; and (5) plaintiff's application would exacerbate an already-existing issue as to solid-waste storage on plaintiff's land. The Board

8

also found plaintiff's expert was not credible in certain, detailed respects. It articulated the proposal would impair the overall zoning plan.

The trial court then heard renewed arguments and found the Board in the amended resolution had properly analyzed the necessary criteria and had given sufficient reasons for the Board's decision denying the application. It ruled, "[t]he resolution is no longer based on conclusory findings and, instead, provides explanations of the standards applied." These standards, the trial court held, "evidenced [the Board's] denial of the application thoroughly[,] . . . conclud[ing] that the requested relief only intensified the nonconformity of the site and with no benefit to the public." The trial court highlighted the Board's comments as to the application's impact on open space and traffic, and that plaintiff already was noncompliant as to density. In an October 27, 2023 order, the court dismissed plaintiff's complaint with prejudice for the reasons set forth on the record that day. This appeal followed.

II.

Land use decisions made by a zoning board carry a presumption of validity, and they will not be reversed unless they are proven to be arbitrary, capricious, or unreasonable, Dunbar Homes, Inc. v. Zoning Bd. of Adj. of Twp. of Franklin, 233 N.J. 546, 558 (2018), or demonstrate a clear abuse of discretion,

9

<u>Price v. Himeji, LLC</u>, 214 N.J. 263, 284 (2013). "The role of a court in reviewing the decision of a local board's land use decision is very narrowly circumscribed." <u>Scully-Bozarth Post #1817 of the VFW v. Planning Bd. of City of Burlington</u>, 362 N.J. Super. 296, 314 (App. Div. 2003). "Courts must give substantial deference to such decisions, recognizing that because of the knowledge possessed by local board members of local conditions and interests, they are best equipped to determine the merits of variance applications." <u>Ibid.</u> "Fundamentally, a reviewing court may not substitute its judgment for that of local officials," as "[i]t is not the role of a reviewing court to determine whether the decision of a local board was wise or unwise." <u>Ibid.</u>

In the local land use context, "[a] board acts arbitrarily, capriciously, or unreasonably if its findings of fact in support of a grant or denial of a variance are not supported by the record, or if it usurps power reserved to the municipal governing body or another duly authorized municipal official." <u>Ten Stary Dom P'ship v. Mauro</u>, 216 N.J. 16, 33 (2013) (citation omitted). And "[b]ecause variances should be granted sparingly and with great caution," greater deference is accorded to a variance's denial than to its grant. <u>Kinderkamack Rd. Ass'n, LLC v. Mayor & Council of Borough of Oradell</u>, 421 N.J. Super. 8, 21 (App. Div. 2011) (alteration in original) (quoting <u>N.Y. SMSA, L.P. v. Bd. of</u>

10

Adjustment, 370 N.J. Super. 319, 331 (App. Div. 2004)); see also CBS Outdoor,

Inc. v. Borough of Lebanon Planning Bd., 414 N.J. Super. 563, 578 (App. Div.

2010).

The same deferential standard of review applies when reviewing a trial

court's decision of an appeal from a zoning board resolution. CBS Outdoor, 414

N.J. Super. at 577. However, we review questions of law de novo, Dunbar

Homes, 233 N.J. at 559, and afford no special deference to the trial court's

interpretations of law or legal conclusions stemming from such interpretations,

Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

The term density is defined as "the permitted number of dwelling units

per gross area of land that is the subject of an application for development . . .

if authorized by municipal ordinance or by a planned development." N.J.S.A.

40:55D-4. When a zoning ordinance limits density for multi-family dwelling

units to a certain number of units per acre and a developer wishes to exceed this

limitation, the developer must apply to the zoning board for a variance. See

Grubbs v. Slothower, 389 N.J. Super. 377, 384 (App. Div. 2007). N.J.S.A.

40:55D-70(d) provides in pertinent part:

> The [Board] shall have the power to:
>
> . . . .

In particular cases for special reasons, grant a variance to allow departure from regulations pursuant to article 8 of this act to permit: . . . (5) an increase in the permitted density as defined in [N.J.S.A. 40:55D-4] A variance under this subsection shall be granted only by affirmative vote of at least five members, in the case of a municipal board, or two-thirds of the full authorized membership, in the case of a regional board, pursuant to article 10 of this act.

. . . .

No variance or other relief may be granted under the terms of this section, including a variance or other relief involving an inherently beneficial use, without a showing that such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.

[N.J.S.A. 40:55D-70(d) (emphasis added).]

The "special reasons" requirement of the statute is often referred to as positive criteria for a variance, Grasso v. Borough of Spring Lake Heights, 375 N.J. Super. 41, 48 (App. Div. 2004), and it is the applicant's burden to demonstrate the existence of that positive criteria. Ten Stary Dom P'ship, 216 N.J. at 30. Generally, sufficient "special reasons" for the grant of a variance pursuant to N.J.S.A. 40:55D-70(d) exist in two broad circumstances: first, when the denial of the project application would impose an undue hardship on the applicant, Loscalzo v. Pini, 228 N.J. Super. 291, 300 (App. Div. 1988); and

second, when a proposed project "promote[s] the purposes of zoning as set forth in N.J.S.A. 40:55D-2," Grubbs, 389 N.J. Super. at 389.

However, the standard for establishing special reasons differs when evaluating a density variance sought pursuant to N.J.S.A. 40:55D-70(d)(5) as opposed to non-density variances. See Grasso, 375 N.J. Super. at 49 (citing Cell South of N.J., Inc.v. Zoning Bd. of Adjustment, 172 N.J. 75, 83 (2002)). The requirement for positive criteria promoting the general welfare is generally satisfied on a finding the proposed site is particularly suitable for the proposed use, Medici v. BPR Co., 107 N.J. 1, 4 (1987). Positive criteria for density variances are present if "the applicant's proofs demonstrate 'that the site will accommodate the problems associated with a proposed use with [a greater density] than permitted by the ordinance'" and "that despite the proposed increase in density . . . the project nonetheless serve[s] one or more of the purposes of zoning and was consistent with the overall goals of the [Municipal Land Use Law]." Grubbs, 389 N.J. Super. at 389 (quoting Randolph Town Ctr. Assocs., L.P. v. Township of Randolph, 324 N.J. Super. 412, 417 (App. Div. 1999)).

In addition to the positive criteria, N.J.S.A. 40:55D-70 also requires certain negative criteria be considered when reviewing a variance application.

Grasso, 375 N.J. Super. at 48. The negative criteria consist of two elements. No relief may be granted unless it can be done (1) "without substantial detriment to the public good"; and (2) without "substantially impair[ing] the intent and purpose of the zone plan and zoning ordinance." Ibid. (quoting N.J.S.A. 40:55D-70(d)).

Regarding the first prong of the negative criteria, the court in Medici concluded the "statutory focus is on the variance's effect on surrounding properties. The board of adjustment must evaluate. . . whether or not [the variance] will cause such damage to the character of the neighborhood as to constitute 'substantial detriment to the public good.'" Medici, 107 N.J. at 22-23 n.12 (citing Yahnel v. Bd. of Adjustment, 79 N.J. Super. 509, 519 (App. Div. 1963)). The Board must weigh "wherein the zoning benefits from the variance are balanced against the zoning harms" and will grant the variance only if "adequate proofs" lead the zoning board to conclude the variance's harms, if any, are not "substantial." Ibid. (quoting Yahnel, 79 N.J. Super. at 519).

## III.

We begin our analysis by noting a discrepancy in the record as to whether plaintiff's property is currently non-conforming as to density. The record contains contradictory information as to how many units are currently on

14

plaintiff's land. When plaintiff first argued its application before the Board,[2] its expert began by stating:

> So, I'll start by briefly describe the existing conditions again. I think our counsel gave a general overview of the site and the site location . . . .
>
> . . . .
>
> We do have the two lots, 2 and 5, which are the MF-8 Zone properties which will be acquisition. Those are the two single-family style housing on them as opposed to the remaining site. The remainder of the site was constructed, I believe post-World War II, but not soon after that likely again predates the existing zoning that you have which is why it's in the EMF zone the existing multi-family zone.
>
> . . . .
>
> The vast majority of those units are one-bedroom units, 282 of the existing units are one-bedroom, 56 of them are two-bedrooms…
>
> . . . .
>
> In addition, the site is I believe broken up between 16 individual buildings. So, you take those 338 units and split them up between 16 buildings.

---

[2] We note that the parties' respective counsel throughout this litigation—from plaintiff's filing of a complaint in lieu of prerogative writs to this appeal—are different than their respective counsel during the application stage, when plaintiff initially presented the application to the Board to prior to the Board's initial denial.

A-0937-23

This characterization is different than what the parties have stipulated throughout this litigation, as the parties have agreed plaintiff's land currently has 266 units split between eighteen buildings. At oral argument, counsel was unable to clarify this discrepancy. The discrepancy is relevant because the Board and the trial court based their respective decisions, in part, on the conclusion that plaintiff's land is currently noncompliant as to density, and any variance would only serve to exacerbate non-compliance, a finding that plaintiff challenges on appeal. Nevertheless, we conclude the Board's detailed litany of other reasons to deny plaintiff's application is sufficient and dispels any argument that the trial court's decision was arbitrary, capricious, or unreasonable, regardless of whether the site is currently non-compliant as to density. Moreover, considering either plaintiff's expert witness's number of existing units or the parties' agreed-on number, plaintiff's proposed development would still require a significant density variance.

Regarding the positive criteria of plaintiff's density variance application, the Board found plaintiff's proposed site plan would exacerbate current noncompliance as to parking and recreational open space, as well as aggravate already-existing traffic and solid-waste storage issues.

The Board cited similar reasons in its analysis of the first prong of

16

negative criteria, finding plaintiff had not shown the variance could be granted without substantial detriment to the public good. Additionally, the Board declined to accept plaintiff's expert's testimony as to the application's effect on traffic and communicated concerns regarding the parking being closer to the buildings than allowed by ordinance, finding it not credible.

Regarding the second prong of negative criteria, the Board found plaintiff had failed to establish the increase in density would not have a more detrimental effect on the neighborhood than if the project was constructed in a manner consistent with the zone's restrictions due to the detrimental effects on already non-compliant parking and recreational open space, as well as the already-existing traffic and solid waste storage issues. The Board also diligently concluded the increase in density could not be approved without also approving substantial numerous bulk variances. To this point, we emphasize plaintiff's density application is not merely seeking to build forty-seven additional units but would require several other substantial bulk variances applied to its property, which is already noncompliance in fourteen separate ways.

We disagree with plaintiff's contention the Board and trial court erred in rejecting its expert's testimony because it was not rebutted. A Board has the choice of accepting or rejecting the testimony of witnesses. Reinauer Realty

Corp. v. Nucera, 59 N.J. Super. 189, 201 (App. Div. 1960). Here, the Board found plaintiff's expert not credible. Specifically, it found: (1) the expert failed to establish the site would accommodate the problems associated with increased density by adding 100 units; (2) his explanation as to the availability of other suitable sites where apartments could be constructed in conformity with the zoning ordinances was insufficient and unsatisfactory; (3) his testimony regarding public transportation was unpersuasive; and (4) he could not provide any testimony to support his position as to appropriate population densities and concentrations that would contribute to the well-being of persons, neighborhoods, communities and regions or preservation of the environment. Nor did the expert show the proposal "encourage the location and design of transportation routes which would promote the free flow of traffic while discouraging location of such facilities and routes which result in congestion or blight."

Despite the uncertainty as to whether plaintiff's land was already noncompliant with respect to density, we conclude the trial court correctly found the Board's decision to deny plaintiff's application was otherwise supported by sufficient evidence in the record and was not arbitrary, capricious, or unreasonable.

A-0937-23

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-0937-23